**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ FEB 2 6 2013 ★

**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

BENITO FRANCO,

                Petitioner,

        -against-

SUPERINTENDENT WILLIAM LEE,

                Respondent.

------------------------------------------------------------------X

**OPINION AND ORDER**
**10-CV-1210 (SJF)**

FEUERSTEIN, J.

       Petitioner Benito Franco ("petitioner"), proceeding pro se, has filed the instant petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. [Docket Entry No. 1] (the "Petition"). A judgment of conviction was entered against petitioner in the County Court of the State of New York, Suffolk County, upon a jury verdict finding him guilty of (1) murder in the second degree, N.Y. PENAL LAW § 125.25, and (2) robbery in the first degree, N.Y. PENAL LAW § 160.15. Following his conviction, petitioner was sentenced to two (2) concurrent terms of incarceration: (1) an indeterminate term of twenty-two (22) years to life and (2) a determinate term of fifteen (15) years. [Docket Entry No. 5] at ¶ 3. For the reasons that follow, the Petition is denied.

I.      Background

       The charges against petitioner arose from a robbery and murder at the Tropical II Bodega in Brentwood, New York on May 20, 2001. Jose Espinal and Jose Aybar, employees of the bodega, testified that they closed the bodega and were walking through the parking lot, along with Jose Bello (Espinal's friend), when two (2) men approached them from behind and one (1) of the

1

men put a gun to the back of Espinal's head.  T. 1005-12.  While the men forced Espinal, Aybar and Bello into the back of Espinal's van, one (1) of the men stabbed Bello.  T. 1015, 1108.  Bello then refused to give the men a chain around his neck and "jumped on top" of the man with the gun. T. 1016.  The man fired several times, killing Bello and wounding Aybar.  T. 1016.

    A.    Trial

        1.    Police Investigation[1]

Detective Gerard McAlvin, a member of the Suffolk County Police Department's Homicide Squad, conducted the investigation of the robbery and murder.  T. 1251.  Detective McAlvin testified that the Suffolk County police had no suspects, despite the investigation of numerous leads, until January 2004 when the New York City Police Department provided information indicating the involvement of Jose Vargas and Juan Perez in the robbery. T. 1259-64.  Perez was arrested on February 7, 2004, and Vargas was interviewed at Southport Correctional Facility in Elmira, New York, where he was incarcerated on an unrelated charge, T. 1264-69, and each confessed to his involvement in the robbery.  T. 1265-66, 67-69.  In their statements to police, Perez referred to an "old man" that participated in the robbery, and Vargas referred to a participant known as "Pa," but neither were able to provide the man's identity. T. 1269-70.  Vargas and Perez were indicted for felony murder and robbery in the first degree. T. 1265-66, 1271.

Vargas was subsequently transported from Southport Correctional Facility to the Suffolk County Jail.  While receiving medical treatment in the infirmary, Vargas recognized another prisoner as the man known to him as "Pa."  T. 1271; T2. 20-22.  After receiving this information,

---

[1]    Testimony not material to petitioner's conviction or to the instant petition has been omitted from the following description of petitioner's trial.

Detective McAlvin inspected the infirmary log and observed that Vargas was treated in the infirmary at the same time as petitioner, who was incarcerated at the time for drunk driving and violation of his parole. T. 1272-73; T2. 49-52. Detective McAlvin showed a photo array containing a photograph of petitioner to Perez, and Perez identified petitioner as the man who drove him to the bodega on the night of the robbery. T. 1273-74, 1275-77.

On April 2, 2005, after learning that petitioner was living in Charleston, South Carolina, T. 1282-96, Detective McAlvin and Detective Ralph Rivera went to speak with petitioner. T. 1299-1302. Petitioner agreed to accompany the detectives to the police station, believing that they intended to give him money owed to him in connection with the confiscation of a car he owned. T. 1299-1302. After realizing that petitioner was intoxicated, the detectives decided not to interview him about the robbery and returned him to his house. T. 1301-02. The detectives returned the following morning, and petitioner again voluntarily accompanied the detectives to the police station. T. 1303. Detective Rivera read petitioner his rights in Spanish, and petitioner acknowledged in writing his understanding and waiver of those rights. T. 1306-10. Petitioner eventually made various inculpatory statements regarding his involvement in the robbery, T. 1319-37, and, after again being informed of his rights, petitioner signed a written statement, T. 1337-39.

According to petitioner's written statement, which was read into the record at trial, he "got together with some other people from Queens to do a robbery out on Long Island," including his son, Benito, Benito's girlfriend, Veronica Diaz ("Diaz"), a man known as "Flaco" (later revealed to be Vargas), and Flaco's friend (later revealed to be Perez). Petitioner picked up Vargas and Perez in petitioner's car and told Vargas that there was a bodega on Long Island that he could rob. T. 1345-46. Petitioner drove to the bodega, went inside, and reported to Vargas that the owner of

3

the bodega and another person were inside. T. 1346-47. Vargas and Perez went across the street to wait for the men inside to close the bodega, and petitioner drove away with Benito and Diaz. T. 1347. About thirty (30) minutes later, Benito received a call from Vargas, who said he had shot someone and asked petitioner to come back and pick him up. T. 1347. Petitioner picked up Vargas and Perez and drove everyone back to Queens. T. 1344-48.

2. Accomplice Testimony

Three (3) of the other participants in the robbery testified at trial, each consistently describing the details of the robbery and petitioner's actions. Perez testified that on the night of May 20, 2001 Vargas (known by Perez at the time as Flaco) and petitioner (identified by Perez at trial) picked him up in a car driven by petitioner and told him that they were going to do a robbery. T. 1128-1132, 1145. Petitioner gave Perez a knife, telling him that he needed a weapon to scare people in the bodega. T. 1132-35-36. After parking in the lot next to the bodega, petitioner went to see how many people were inside. T. 1138-40. When petitioner returned, he told Perez and Vargas to wait until the employees closed for the night, and Perez and Vargas went to wait in the woods nearby. T. 1139-40.

When the employees walked out of the bodega, Vargas and Perez approached them and told them not to move. T. 1140. One (1) of the men moved, and Perez stabbed him. T. 1140-41. Vargas told the men to get into the van and face the floor. T. 1141. When one (1) of the men tried to grab Vargas' gun, Vargas shot him. T. 1141. Perez and Vargas then ran and hid under a car until petitioner picked them up and drove everyone back to Queens. T. 1142-43.

Vargas testified that it was petitioner's idea to rob the bodega. T2. 6-7. On the night of the robbery, petitioner, Benito and Diaz picked up Vargas at his house. T2. 9-11. Vargas recruited Perez to help with the robbery. T2. 11-12. Benito gave Vargas a gun, and Vargas gave

4

Perez a knife. T2. 13, 17. Petitioner went inside the bodega to "see if there were a lot of people in there, see if they were going to get ready to close." T2. 15. Petitioner returned and told Vargas and Perez to go hide behind the bodega until the employees came outside. T2. 15-16. Three (3) men walked out of the bodega, and Vargas and Perez "told [them] to get into the van" and demanded money. T2. 17. After "a little fight," Vargas shot Bello. T2. 18.[2]

Diaz testified that she and Benito got into a car driven by petitioner and that there was a "light-skinned Dominican" in the front seat, who Diaz identified at trial as Vargas. T. 1192-97, 1217. She did not remember whether anyone else was in the car but testified that it was "really tight" in there, T. 1197, 1212, 1224, and recalled that there was a discussion during the ride to Long Island between petitioner and Vargas about a knife. T. 1198-1201, 1220. After arriving at the bodega, petitioner went inside to "check if they have any cameras and who was there and to see if they were about to close and stuff like that." T. 1201. When he returned, petitioner said that there were three (3) people inside and that they were getting ready to close for the night. T. 1202. Petitioner also said that there was money in the van parked next to the bodega. T. 1203. After Vargas walked toward the bodega, Diaz heard gunshots and petitioner drove away. T. 1203-04. Benito received a phone call on his cell phone, and petitioner returned to pick up Vargas. T. 1204.

### 3. Petitioner's Testimony

Petitioner testified at trial and denied that he was involved in the robbery. T2. 47. Petitioner testified that he first met Vargas and Perez in 2004 while he was incarcerated in the Suffolk County Jail for drunk driving and violation of his parole. T2. 49-52. With respect to his statements to Detectives McAlvin and Rivera, petitioner testified that he was intoxicated during

---

[2] Vargas also testified that after he was incarcerated in the Suffolk County Jail, he saw petitioner (who he knew at the time as "Pa") in the infirmary and informed his lawyer, who told the police. T2. 20-21.

the interrogation and that the detectives coerced him into making the statements. Petitioner testified that he "started drinking Friday night, Saturday in the daytime, Saturday night" and that he was very drunk when the detectives arrived on April 2, 2005. T2. 60. After the detectives returned him to his home that night, he drank "[a]ll night" and was still drunk when the detectives returned the next morning because he "didn't stop from [drinking] [since] the time they brought [him] back." T2. 62-64. Petitioner testified that during the interrogation the officers "pushed [him] back" and "were going to hit [him]" and that "[a]fter all of them got up to me, [] [he] ha[d] to do whatever they want[ed] because [he] was drunk and they were about to hit [him] and [he] wanted to go to the bathroom." T2. 66-68.

Petitioner testified that he did not understand the documents that he signed and that the officers "took [his] hand so [he] could sign[ because] [he] was drunk and [] so sleepy." T2. 69. Petitioner also said he signed the documents because Detective Rivera told him he "had to do that because every time [he] didn't—didn't sign, his bosses get angry and he didn't want his boss to get angry, because if he did that he wouldn't like it," and that he was scared because "[t]here were three of them and they had a pistol and there wasn't anybody else there." T2. 69.

B.    Post-Conviction Procedural History

Petitioner appealed from his judgment of conviction to the Appellate Division of the Supreme Court of the State of New York, Second Department, on the grounds that: (1) the trial court erred by admitting the photo arrays from which petitioner was identified; (2) the sentence imposed was harsh and excessive; (3) petitioner was denied his right against self-incrimination by the trial court's admission of evidence showing that he refused to give a videotaped confession; (4) the trial court erred by allowing petitioner's alleged accomplice to make an in-court identification of petitioner; (5) the prosecution failed to prove petitioner's guilt beyond a

reasonable doubt; and (6) the prosecutor committed prosecutorial misconduct by inferring to the jury that petitioner bore the burden of proving his innocence. Petition at 7-8.

By order dated February 5, 2008, the Appellate Division affirmed petitioner's conviction, holding that: (1) certain testimony regarding the photo arrays used to identify petitioner was admitted in error, but "the evidence of [petitioner's] guilt, without reference to the alleged error, was overwhelming," and thus any error was harmless; (2) the sentence imposed by the trial court was not harsh and excessive; (3) petitioner's argument that the trial court erred in admitting evidence of his refusal to give a videotaped statement to police was not preserved for appellate review and was without merit; (4) "there [was] no merit to [petitioner's] contention that his accomplice's identification testimony should have been suppressed, as the identification was merely confirmatory"; (5) petitioner's argument that the evidence was legally insufficient to establish his guilt was not preserved for appellate review, and the evidence was sufficient to establish petitioner's guilt beyond a reasonable doubt; and (6) "petitioner's remaining contention," i.e., that petitioner was prejudiced by alleged prosecutorial misconduct, was "without merit." People v. Franco, 48 A.D.3d 477, 850 N.Y.S.2d 636 (N.Y. App. Div. 2008). Petitioner presented the same claims to the New York Court of Appeals, which denied leave to appeal on April 21, 2008. People v. Franco, 10 N.Y.3d 840, 889 N.E.2d 86, 859 N.Y.S.2d 399 (2008).

Petitioner also filed a motion pursuant to New York Criminal Procedure Law ("CPL") § 440.10 ("section 440.10") seeking to vacate his judgment of conviction on the ground of ineffective assistance of trial counsel. The trial court denied the motion on November 17, 2008 and denied leave to appeal on February 25, 2010.

On October 22, 2009, petitioner filed the instant petition, raising the same grounds for relief as he raised in the appeal of his conviction to the Appellate Division and his section 440.10

motion. Petition at ¶ 13.[3]  Respondent filed his response on April 23, 2010.  [Docket Entry

No. 5] ("Resp.").

II.      Standard for Habeas Corpus Review

Pursuant to 28 U.S.C. § 2254(d), an application for a writ of habeas corpus

> shall not be granted with respect to any claim that was adjudicated on the merits in
> State court proceedings unless the adjudication of the claim – (1) resulted in a
> decision that was contrary to, or involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme Court of the United States;
> or (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

"An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and

(2) reduces its disposition to judgment.'"  Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007)

(quoting Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)).  Claims that were not adjudicated

on the merits in state court are not subject to the deferential standard that applies under AEDPA.

See Cone v. Bell, 556 U.S. 449, 472 (2009) (citing 28 U.S.C. § 2254(d)).  Where AEDPA's

deferential standard of review does apply, "[a] state court's determination of a factual issue is

presumed to be correct, and may only be rebutted by clear and convincing evidence."

Bierenbaum v. Graham, 607 F.3d 36, 48 (2d Cir. 2010) (citing 28 U.S.C. § 2254(e)(1)).

Federal habeas review is limited to determining whether a petitioner's custody violates

federal law, see 28 U.S.C. § 2254(a), and "does not lie for errors of state law."  Swarthout v.

Cooke, 131 S. Ct. 859, 861 (2011) (internal quotation marks omitted).  An unreasonable

application of established federal law occurs "if the state court arrives at a conclusion opposite to

that reached by [the Supreme] Court on a question of law or if the state court decides a case

---

[3]      Petitioner has failed to include any legal or factual arguments in support of the Petition.
Since the asserted grounds for relief are the same as those raised on appeal to the Appellate
Division and in the section 440.10 motion, the Court has relied upon petitioner's briefing in those
matters.

differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Alternatively, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Id. at 413.

The Supreme Court has stated that "[a]s amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." Harrington v. Richter, 131 S. Ct. 770, 786 (2011) ("If this standard is difficult to meet, that is because it was meant to be."). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. (internal quotation marks omitted). A state court's unreasonable application of law must have been more than "incorrect or erroneous"; it must have been "objectively unreasonable." Sellan, 261 F.3d at 315 (quotations and citation omitted); see also Sorto v. Herbert, 497 F.3d 163, 169 (2d Cir. 2007) ("[I]t is well-established in this Circuit that the 'objectively unreasonable' standard of § 2254(d)(1) means that petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief.") (internal quotation marks omitted).

III. Analysis

A. Procedurally Defaulted Claims

"Under the independent and adequate state ground doctrine, a federal court sitting in habeas 'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.' Independent and adequate state law grounds preventing federal review include violations of state procedural rules . . . ." Richardson v. Greene, 497 F.3d 212, 217 (2d Cir. 2007)

(quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)) (citation omitted). To bar federal

habeas review, "the last state court to render judgment must clearly and expressly state that its

judgment rested on a state procedural bar." Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997)

(internal quotation marks and alterations omitted); see also Jones v. Stinson, 229 F.3d 112, 118 (2d

Cir. 2000). Federal review is barred by an independent and adequate state ground "even where

the state court has also ruled in the alternative on the merits of the federal claim." Velasquez v.

Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).

Here, the Appellate Division rejected petitioner's claims (1) that the trial court improperly

admitted testimony concerning his decision not to give a videotaped statement to police, and

(2) that the evidence at trial was legally insufficient to establish his guilt on the ground that the

claims were not properly preserved for appellate review.[4] Franco, 850 N.Y.S.2d at 636-38. New

York law "requires a contemporaneous objection to any alleged legal error by defense counsel at a

criminal trial." Richardson, 497 F.3d at 217 (citing CPL § 470.05(2)). The New York

preservation rule applies to both insufficiency and inadmissibility of evidence claims, see People

v. Lane, 7 N.Y.3d 888, 860 N.E.2d 61 (2006) (holding that claim of insufficiency of evidence was

not preserved for appellate review); People v. Jacquin, 71 N.Y.2d 825, 826, 522 N.E.2d 1026

(1988) (holding that claims of inadmissibility of evidence were not preserved for appellate

review), and "has been recognized as an independent and adequate state procedural rule barring

habeas review." Mendez v. Graham, No. 11-CV-5492, 2012 WL 6594456, at *10 (E.D.N.Y.

Dec. 18, 2012) (citing Richardson, 497 F.3d at 218). "A federal court will nonetheless consider a

---

[4]     Although petitioner moved to dismiss the action against him at the conclusion of the
prosecution's case, Resp. at 17, petitioner failed to renew his application at the conclusion of his
case or the prosecution's rebuttal. T2. 135-36. See, e.g., People v. Bloom, ---N.Y.S.2d ---, 2013
WL 474718, at *1 (App. Div. Feb. 8, 2013) ("[Defendant's] contention that the evidence is legally
insufficient to support the conviction is not preserved for our review because defendant failed to
renew his motion for a trial order of dismissal after presenting proof.").

procedurally defaulted claim if the petitioner can show 'cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" Mendez, 2012 WL 6594456, at *10 (quoting Coleman, 501 U.S. at 750); see also Spence v. Superintendent, Great Meadow Corr. Facility, 219 F.3d 162, 170 (2d Cir. 2000) ("[P]rocedural default in state court will bar federal habeas review unless the petitioner can either: (1) show cause for the default and actual prejudice as a result of the constitutional violation, or (2) demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice, or, in other words, an unjust incarceration.") (internal quotation marks and citation omitted) (citing Murray v. Carrier, 477 U.S. 478, 496 (1986) ("[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a [writ of habeas] may [be] grant[ed] even in the absence of a showing of cause for the procedural default.")).

Petitioner has failed to offer any cause for his default. Moreover, although petitioner alleges that he is actually innocent of the crimes for which he was convicted, he has failed to offer any new evidence in support of this contention or to demonstrate that the Court's refusal to review these claims will result in a fundamental miscarriage of justice. See Schlup v. Delo, 513 U.S. 298, 316 (1995) ("Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim. However, if a petitioner . . . presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims."). Therefore, petitioner's claims that the evidence at trial was not sufficient to support his

conviction and that evidence of his refusal to give a videotaped statement was improperly admitted are barred from habeas review by the Court.

B.    Photo Arrays

Petitioner asserts that "[t]he trial court committed reversible error when it permitted the People to introduced [sic] into evidence the photo array from which petitioner was identified." Petition at ¶ 13.  Petitioner argued the issue more fully on appeal to the Appellate Division and identified three (3) additional alleged errors:   (1) the admission of the "'testimony by Detective McAlvin that [petitioner's] alleged accomplice, Juan Perez had identified appellant from the photo array"; (2) "the [prosecutor's] suggesting during his questioning of the detective that appellant's other alleged accomplice, Jose Vargas had also identified appellant from a photo array"; and (3) the detective's testimony that Espinal and Aybar had identified appellant as having been a customer at the bodega".   App. Brief at 23.

The basis for petitioner's argument is the decision of the New York Court of Appeals in People v. Trowbridge, 305 N.Y. 471, 113 N.E.2d 841 (1953), superseded in non-relevant part by CPL § 60.25, which established the general rule that it is error for a trial court to admit testimony corroborating a witness' prior identification of the defendant.   See, e.g., Mims v. Walsh, No. 04-CV-6133, 2012 WL 4786480, at *11 (S.D.N.Y. Oct. 3, 2012) ("[U]nder New York law it generally is impermissible for one witness to confirm an identification previously made by another witness."); People v. Giallombardo, 512 N.Y.S.2d 481, 482 (App. Div. 1987) ("As a general rule, it is improper to admit testimony from a complaining witness that he identified the defendant from a photograph."); People v.Holt, 67 N.Y.2d 819 (1986) (holding that it was error for the trial court to permit a police officer to testify that he arrested the defendant after speaking to an eyewitness, as the testimony was "implicit bolstering").   However, "where the defendant opens the door to this

inquiry during his cross-examination of the witness," it is "not improper for the prosecutor to elicit from a complaining witness, on redirect examination, that he had previously identified the defendant from a photograph." Giallombardo, 512 N.Y.S.2d at 548.

Although petitioner's cross-examination may have opened the door to testimony regarding the pretrial identification procedures employed by the police in the case, the Appellate Division agreed with petitioner that "the prosecutor's questioning of Detective McAlvin as to the photo arrays went beyond what was necessary to clarify matters." Franco, 850 N.Y.S.2d at 637. However, the Appellate Division further held that "the evidence of the defendant's guilt, without reference to the alleged error, was overwhelming, and there is no significant probability that the alleged error might have contributed to the defendant's conviction. Thus, any error was harmless." Id.

"A claim of improper 'bolstering' in violation of Trowbridge is not [itself] a cognizable basis for federal habeas relief," Smith v. Riley, No. 90-CV-3094, 1995 WL 1079778, at *7 (E.D.N.Y. Jan. 26, 1995); see also Mendez, 2012 WL 6594456, at *12 (holding that Trowbridge error "is a state law claim that does not raise a federal question"), and even if the trial court erred in admitting the testimony under New York state law, "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983). To rise to such a level, the erroneously admitted evidence must have been "'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" McKinnon v. Superintendent, Great Meadow Corr. Facility, 422 F. App'x 69, 73 (2d Cir. 2011) (quoting Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985)).

The admission of bolstering testimony in contravention of state law has been to be

insufficiently prejudicial to rise to the level of a constitutional violation.  See Mendez, 2012 WL

6594456, at *12 n.4 ("'Although bolstering is a practice prohibited . . . in New York, the practice is

not forbidden by the Federal Rules of Evidence and is not sufficiently prejudicial to deprive a

defendant of his due process rights to a fair trial.'") (quoting Vega v. Berry, No. 90-CV-7044,

1991 WL 73847, at *2 (S.D.N.Y. Apr. 29, 1991)); Diaz v. Greiner, 110 F. Supp.2d 225, 234 n.13

(S.D.N.Y. 2000) ("Admission of bolstering testimony amounts to harmless error (if, indeed, there

was any error), because it did not have 'substantial and injurious effect or influence in determining

the jury's verdict,' in light of the substantial (other) evidence against Petitioner.  There was

substantial evidence, even excluding the alleged 'bolstering' testimony, to allow a rational trier of

fact to convict."); Orr v. Schaeffer, 460 F. Supp. 964, 967 (S.D.N.Y. 1978) ("As to petitioner's

assertion that such evidence of prior identification is improper 'bolstering,' this Circuit has never

regarded the practice as inimical to trial fairness.") (citing United States v. De Sena, 490 F.2d 692,

694 (2d Cir. 1973) ("This circuit appears to allow such corroboration of in-court

identifications.")); Quinney v. Conway, 784 F. Supp.2d 247, 260 (W.D.N.Y. May 16, 2011)

("Federal courts have held that a claim of a bolstering [Trowbridge] violation has 'no place as an

issue in criminal jurisprudence based on the United States Constitution.").

Here, the challenged evidence did not suggest that an out-of-court identification

implicating petitioner was made by anyone that did not testify at trial.  Rather, the evidence

merely bolstered the in-court identifications of petitioner's accomplices.  While such bolstering is

not permissible under New York law, it "cannot be equated with police testimony improperly

implying that a witness who was not brought to testify did in fact implicate the defendant."

People v. Polidore, 581 N.Y.S.2d 827, 837 (App. Div. 1992) (internal quotation marks and

citations omitted).  See also People v. Burgess, 410 N.Y.S.2d 837 (App. Div. 1978) ("While court

14

and counsel should be careful to guard against impermissible bolstering, it would appear to us that such bolstering standing alone would rarely constitute reversible error except where there is a reasonable danger that the jury may take an officer's testimony, that the eyewitness victim identified the perpetrator, as a substitute for identification by the eyewitness victim . . . ."); cf. People v. Melendez, 55 N.Y.2d 445, 452 (1982) ("[I]t was error to permit the prosecutor to elicit from [the detective] the hearsay testimony that a 'concerned citizen' had informed him two days after the shooting that [the defendant] was one of the participants in the crime."). Therefore, to the extent the trial court violated Trowbridge, such error was harmless in light of the substantial evidence supporting petitioner's conviction. See Lebron v. Sanders, No. 02-CV-6327, 2008 WL 793590, at *20 (S.D.N.Y. Mar. 25, 2008) ("[I]mproper bolstering at trial . . . does not constitute reversible error.").

C.      Unduly Harsh Sentence

Petitioner asserts that his sentence was harsh and excessive. "No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992); see also Garrett v. Smith, No. 05-CV-3374, 2006 WL 2265094, at *12 (E.D.N.Y. Aug. 8, 2006). Petitioner was convicted of murder in the second degree, a class A-1 felony, N.Y. PENAL LAW § 125.25, and robbery in the first degree, a class B felony, N.Y. PENAL LAW § 160.15. New York law provides that an indeterminate sentence for a class A-I felony may range from twenty-five (25) years to life imprisonment. N.Y. PENAL LAW § 70.00.

Petitioner was sentenced to two (2) concurrent terms of incarceration:   (1) an indeterminate term of twenty-two (22) years to life and (2) a determinate term of fifteen (15) years. Therefore, petitioner's sentence is within the range permitted by New York law, and his excessive

sentence claim must be denied.

D.      Accomplice Identification

Petitioner asserts that the trial court erred by allowing Perez to make an in-court

identification of petitioner since the prosecution failed to provide testimony at the Wade hearing

from the detective who showed the photo array to Perez.    App. Brief at 38.    See People v. Chipp,

75 N.Y.2d 327, 337 (1990) ("[T]he purpose and function of the Wade hearing is to determine

whether a police-arranged pretrial identification procedure such as a lineup, was unduly

suggestive.").    The Appellate Division held that "[t]here is no merit to [petitioner's] contention

that his accomplice's identification testimony should have been suppressed, as the identification

was merely confirmatory."    Franco, 850 N.Y.S.2d at 637.

In evaluating an out-of-court identification procedure, courts apply a two-step inquiry to

determine:    (1) whether the procedure was impermissibly suggestive, and if so, "whether it was so

suggestive as to raise 'a very substantial likelihood of irreparable misidentification'"; and (2) if the

procedure was unnecessarily suggestive, whether the identification was independently reliable.

King v. Phillips, No. 03-CV-6045, 2009 WL 891763, at *1 (E.D.N.Y. Mar. 31, 2009) (quoting

Neil v. Biggers, 409 U.S. 188, 198 (1972)).    "'In cases in which the defendant's identity is not in

issue, or those in which the protagonists are known to one another, 'suggestiveness' is not a

concern," and the identification is merely confirmatory.    People v. Rodriguez, 79 N.Y.2d 445,

449 (1992) (internal quotation marks and alterations omitted).    "A court's invocation of the

'confirmatory identification' exception is thus tantamount to a conclusion that, as a matter of law,

the witness is so familiar with the defendant that there is 'little or no risk' that police suggestion

could lead to a misidentification."    Id. at 450; see also People v. King, 736 N.Y.S.2d 904, 905

(App. Div. 2002) (affirming rejection of motion to suppress voice identification evidence because

16

"the People established that the identification was merely confirmatory, since the identifying witness had worked with the defendant for years, and the defendant acknowledged that he was well acquainted with the witness").

Petitioner fails to show that the state court's conclusion that Perez's in-court identification of petitioner was independently reliable was based upon an unreasonable determination of the facts. Perez testified that he was in petitioner's presence for an extended period of time on the night of the robbery and had substantial interaction with petitioner. In these circumstances, it was not unreasonable for the trial court to conclude that Perez's pre-trial photographic identification of petitioner was merely confirmatory and that any suggestiveness in the procedure was not of concern. See People v. Avent, 813 N.Y.S.2d 786 (App. Div. 2006) ("[T]he hearing testimony established that the eyewitness was sufficiently familiar with the defendant that his photographic identification was confirmatory."); People v. Jones, 729 N.Y.S.2d 636 (App. Div. 2001) ("[S]ince the witness was personally acquainted with the defendant, the photographic identification procedure was merely confirmatory.").

E.     Prosecutorial Misconduct

At trial, the prosecution elicited testimony from Detective McAlvin that petitioner did not contact the police to provide information about the robbery before being interviewed in South Carolina. App. Brief 25-26; T. 1470-72. According to petitioner, this line of questioning "shifted the burden of proof and inferred that it was [petitioner's] obligation to come forward with evidence." App. Brief at 25. Petitioner's motion for a mistrial upon this basis was denied by the trial court. T. 1485-87.

Even if the prosecutor's line of questioning to Detective McAlvin improperly implied that petitioner bore the burden of proving his innocence, petitioner is "'not entitled to habeas relief

17

based on trial error unless [he] can establish that it resulted in actual prejudice.'" Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)) (emphasis omitted); see also Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir. 1991) ("A criminal conviction 'is not to be lightly overturned on the basis of a prosecutor's comments standing alone' in an otherwise fair proceeding.") (quoting United States v. Young, 470 U.S. 1, 11 (1985)). To determine whether this standard has been met, the Court may consider, inter alia: "(1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prejudicial conduct." Bentley, 41 F.3d at 824.

The circumstances here do not support the conclusion that petitioner suffered actual prejudice from the prosecutor's conduct: (1) the line of questioning was brief and not egregious since the prosecutor only intended to rehabilitate a prior witness that was impeached on the basis that he did not come forward with information after the crime; (2) the trial court gave clear instructions to the jury prior to its deliberations that the prosecution bore the burden of proof, thereby correcting for any improper inference created by Detective McAlvin's testimony; and (3) the strength of the evidence supporting petitioner's conviction, including his confession and the testimony of three (3) of his accomplices, made any prejudicial effect of Detective McAlvin's testimony unlikely. See Gonzalez, 934 F.3d at 424 ("Given the court's corrective actions and the strength of the evidence against the petitioner, the prosecutor's summation did not render the trial fundamentally unfair.").

Petitioner also asserts that the prosecution impermissibly shifted the burden of proof and violated petitioner's right against self-incrimination when the prosecutor "commented to the jury [during summation] that [petitioner's] alleged accomplice, Juan Perez was willing to make a

videotaped statement, but [petitioner] had not done so." App. Brief at 27.[5]  Given that petitioner

voluntarily gave both oral and written statements to the police implicating himself in the crime, the

prosecution's acknowledgment that petitioner refused to give a videotaped statement, to the extent

impermissible at all, cannot be held to have infringed his constitutional protection from

self-incrimination.  See People v. Dominique, 831 N.Y.S.2d 85 (App. Div. 2007) ("The

defendant's contention that the court improperly allowed testimony that he refused to make a

videotaped confession is similarly without merit, as the defendant clearly agreed to speak to the

police, thus waiving his right to remain silent."); People v. Crichton, 686 N.Y.S.2d 311 (App. Div.

1999) ("We find no merit to the defendant's contention that his Fifth Amendment right against

self-incrimination was violated by the testimony at trial of a police officer to the effect that the

defendant refused to give a videotaped statement after giving both oral and written statements

admitting to the crime.").  Moreover, there is no indication that "the prosecutor's comments

during summation had a substantial and injurious effect or influence in determining the jury's

verdict." Bentley, 41 F.3d at 824.

Therefore, petitioner's claim for relief based upon alleged prosecutorial misconduct is

denied.

F.    Ineffective Assistance of Counsel

Petitioner has failed to include any argument with respect to this claim, and therefore the

Court presumes that petitioner is attempting to raise the same issues as those raised in his section

440.10 motion.  Petitioner asserts that he was denied the effective assistance of counsel by his

---

[5]    "It is well established that a defendant has a constitutional right to remain silent at the time
of his or her arrest and that his or her exercise of that right to remain silent at or after his or her
arrest may not be used by the [prosecution] as part of their direct case."  People v. Hendricks, 646
N.Y.S.2d 845 (App. Div. 1996); see also Miranda v. Arizona, 384 U.S. 436, 468 n.37 (1966) ("The
prosecution may not, therefore, use at trial the fact that [the defendant] stood mute or claimed his
privilege in the face of accusation.").

attorney's failure to offer at trial the testimony of an expert toxicologist that petitioner was intoxicated at the time he waived his Miranda rights and gave inculpatory statements to police. CPL § 440.10 Motion, People v. Franco, Ind. No. 1024/05 (N.Y. Sup. Ct. Dec. 22, 2008). In rejecting petitioner's motion, the trial court held as follows:

> [T]he only evidence that defendant submits in support of a claim that he was intoxicated at the time of his confession is his own self-serving affidavit. The testimony from the Suffolk County detectives at both the pretrial Huntley hearing and at trial was that when they first approached defendant to speak to him regarding these crimes, they found him to be intoxicated and therefore, advised him that they would come back to speak to him the next morning. When they returned, the detectives found that defendant was no longer intoxicated and proceeded to question him. Defendant's claim now, for the first time, that he was still intoxicated the next morning is contrary to the testimony of the detective who testified and unsupported by an [sic] proof.

Order, People v. Franco, Ind. No. 1024/05 (N.Y. Sup. Ct. Nov. 17, 2009).

In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, petitioner must prove that (1) "counsel's performance was deficient, so deficient that, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance, and (2) he must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Bennett v. United States, 663 F.3d 71, 84 (2d Cir. 2011) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984) (internal citations and quotation marks omitted)). The Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689. Moreover, because the AEDPA requires federal courts to give state courts "deference and latitude" when considering an ineffective assistance of counsel claim on habeas review, Harrington, 131 S.Ct. at 786, a petitioner must demonstrate that it was "necessarily unreasonable" for the state

court to conclude that the petitioner had not overcome the presumption of competence and that he had failed to undermine confidence in the jury's verdict, Cullen v. Pinholster, 131 S.Ct. 1388, 1403 (2011).

"There is no per se rule that requires trial attorneys to seek out an expert," Gersten v. Senkowski, 426 F.3d 588, 609 (2d Cir. 2005) (internal quotation marks omitted), and "an attorney's 'failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel,'" Hase v. Holder, 363 F. App'x 133, 135 (2d Cir. 2010) (quoting United States v. Eyman, 313 F.3d 741, 743 (2d Cir. 2002)). See also Mills v. Poole, No. 06-CV-842A, 2008 WL 2699394, at *26 (W.D.N.Y. June 30, 2008) ("In general, whether or not to hire an expert is the type of strategic choice by counsel that may not be second-guessed on habeas corpus review.").

Petitioner's own testimony is the only support for his assertion that he was sufficiently intoxicated at the time of his interrogation to render his confession involuntary, and there is no indication that an expert was available and willing to testify in support of his position. See Mills v. Lempke, No. 11-CV-440, 2013 WL 435477, at *19 (W.D.N.Y. Feb. 4, 2013) (rejecting claim that trial counsel's failure to call expert witness to present, inter alia, intoxication defense, was ineffective assistance of counsel where the petitioner "has not come forward with affidavits or other admissible evidence showing that there was, indeed, an expert witness who would have testified as he hoped"); People v. Hunter, 894 N.Y.S.2d 685, 686 (App. Div. 2010) (rejecting ineffective assistance of counsel claim on basis of counsel's failure to call an expert in support of intoxication defense where "[d]efendant has not demonstrated that such testimony was available, that it would have assisted the jury in its determination or that he was prejudiced by its absence") (internal quotation marks omitted); People v. Muller, 869 N.Y.S.2d 270, 271-72 (App. Div. 2008)

21

(rejecting ineffective assistance of counsel claim on basis of counsel's failure to call an expert in support of intoxication defense where "expert testimony was not required to prove the intoxication defense and defendant now offers little more than speculative assertions that an expert's testimony would have supported it"). Therefore, there is no basis for the Court to conclude that petitioner's attorney acted unreasonably in choosing not to offer expert testimony.

Furthermore, petitioner testified at trial that he was intoxicated and that his statements to the detectives were coerced. Therefore, even without a toxicologist's expert testimony, the question of whether petitioner's confession was voluntary was presented to the jury. See Shaw v. Miller, No. 99-CV-5020, 2001 WL 739241, at *3 (E.D.N.Y. June 26, 2001) (holding that admission of expert testimony regarding voluntariness of the defendant's confession would not have created an otherwise absent reasonable doubt where "ample evidence was put before the jury concerning the issue about which the expert would have testified," including the defendant's testimony that police officers beat and coerced him); Lempke, 2013 WL 435477, at *19 ("Even without an expert, trial counsel was able to put forward a defense based on [the petitioner's] intoxication . . . through other proof."); United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) ("[T]he witness [the defendant] asserts should have been called would have testified in a manner corroborative of another witness; counsel might well have regarded the testimony as unnecessarily cumulative.").

There is also no indication that either the trial court's determination of the admissibility of petitioner's statements at the Huntley hearing or the jury's ultimate findings would have been swayed by a toxicologist's testimony. In determining whether a defendant's statement was given voluntarily or coerced, the relevant inquiry is "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession," taking into account "both the

characteristics of the accused and the details of the interrogation." Dickerson v. United States, 530 U.S. 428, 434 (2000) (internal quotation marks omitted). The trial court held a Huntley hearing on August 24, 2005 and found, "[b]ased upon all the testimony and the evidence in th[e] case," that the prosecution met their burden to establish that petitioner's statements were give voluntarily, as "the defendant was given his Constitutional [sic]warnings before these statements were taken, that he understood those warnings, that he made a free and voluntarily [sic] waiver of his rights, that the waiver was a knowing, intelligent waiver, that the statements made to the police were freely and voluntarily given." Transcript of Hearing at 138-39, People v. Franco, No.1024-2005 (Cnty. Ct. Aug. 24, 2005). Given the substantial evidence in support of the trial court's determination that petitioner understood and knowingly waived his rights, it is unlikely that an expert toxicologist's testimony would have altered the court's findings. See Missouri v. Seibert, 542 U.S. 608-09 (2004) ("[G]iving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver."); Alvarez v. Keane, 92 F. Supp.2d 137, 150 (E.D.N.Y. 2000) ("Even evidence of a defendant's intoxication with alcohol or a controlled substance does not preclude a finding of a knowing and intelligent waiver provided that [the defendant] appreciate[d] the nature of the waiver."); United States v. DiLorenzo, No. 94-CR-303, 1995 WL 366377, at *8-9 (S.D.N.Y. June 19, 1995) ("[A] claim that a defendant was exhausted or suffering from the effects of alcohol is not, in the absence of coercive law enforcement activity, sufficient to characterize his confession as involuntary."). Furthermore, in light of the overwhelming evidence of petitioner's guilt and the jury's capability to evaluate petitioner's claims of intoxication, there is no substantial likelihood that a toxicologist's testimony

would have changed the jury's findings.

III.    Conclusion

For the foregoing reasons, the Petition is denied.   As petitioner has failed to make a substantial showing of a violation of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253(c)(1).   In accordance with Federal Rule of Civil Procedure 77, the Clerk of Court shall serve a copy of this order upon all parties, including petitioner at his last known address.

The Clerk of Court is directed to close this case.


**SO ORDERED.**

s/ Sandra J. Feuerstein

SANDRA J. FEUERSTEIN
United States District Judge

Dated: February 26, 2013
       Central Islip, New York